In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-3595 and 00-3861

MULTI-AD SERVICES, INCORPORATED,

Petitioner-Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner.

Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board.

ARGUED APRIL 5, 2001--DECIDED June 21, 2001

Before BAUER, RIPPLE and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.  This petition asks us to review whether Multi-Ad Services, Incorporated ("Multi-Ad") violated the National Labor Relations Act, 29 U.S.C. sec. 151 et seq., ("Act") by interfering with its employees' efforts to form a union. The National Labor Relations Board ("Board") concluded that Multi-Ad violated sec. 8(a)(1) of the Act, 29 U.S.C. sec. 158(a)(1), by (1) coercively interrogating employee Ted Steele about his interest in forming a union; (2) impliedly promising to help Mr. Steele improve his employment situation without the need for union representation; and (3) threatening to close one of its departments if that department's employees unionized. The Board also concluded that Multi-Ad violated sec.sec. 8(a)(1) and (3) of the Act, 29 U.S.C. sec.sec. 158(a)(1) and (3), by discharging Mr. Steele because it believed that he might contact a union to organize employees. Multi-Ad now petitions for review of the Board's order; the Board has filed a cross-application for enforcement of its order. For the reasons set forth in this opinion, we deny the petition for review and grant enforcement of the Board's order.

I

BACKGROUND

A.  Facts

   Multi-Ad employs 450 workers at its full-service advertising art production facility in Peoria, Illinois. Multi-Ad hired Mr. Steele in 1989 to work in the bindery department. Fifteen employees work in the department, which manufactures looseleaf, three-ring binders. The bindery department is a small operation, accounting for a limited percentage of the company's sales and profits. Mr. Steele's performance evaluations were above average throughout his tenure at the company.

   Multi-Ad became an employee stock ownership company in 1986. Multi-Ad holds quarterly meetings in which management discusses the company's financial performance and work-related issues. At these meetings, employees often air their concerns and ask management questions regarding the direction of the company. Typically, these meetings break down into smaller, departmental meetings. Management encourages, but does not require, attendance at these quarterly meetings.

   On July 29, 1996, Multi-Ad held a quarterly meeting for employees of the bindery, press, and finishing departments. After discussing the company's financial performance, plant production manager Jerry Ireland announced the company's plan to implement a new drug-testing policy. Following this announcement, Mr. Steele spoke up and openly criticized the policy, contending in a loud and persistent manner that such testing violated employees' right to privacy. Other employees also voiced their displeasure with the policy. Mr. Steele and Larry Clore, Multi-Ad's president, then began to argue about the policy's legality. At the end of this exchange, Mr. Steele requested a copy of Multi-Ad's laws and bylaws. Clore told Mr. Steele that he could have these materials after the meeting.

   Later that day, the quarterly meeting split into separate departmental meetings. The bindery department meeting commenced around 3:00 p.m., the normal quitting time for day-shift employees. At

this meeting, Clore gave Mr. Steele a summary plan description of Multi-Ad's corporate structure. After Mr. Steele pointed out that he wanted the complete bylaws and not a summary, Clore responded, "[H]ave your lawyer get them." Tr. at 33. Clore then told Mr. Steele that if he did not like the company's drug policy, "[W]hy don't you think about leaving the company?" Id. at 154. Mr. Steele responded that he would not give Clore the pleasure of quitting. After Clore departed, Ireland tried to continue with the meeting, but Mr. Steele announced that he was leaving because "he was on his own time now." Id. at 155. Mr. Steele testified that Ireland said, "[O]kay." Id. at 33. Ireland, however, testified that Mr. Steele's remark had shocked him and that he had said nothing in response. Ireland also testified that he had apologized to the group for Mr. Steele's behavior. Mr. Steele, however, was not ordered to remain for the rest of the meeting, which ended shortly after his exit.

Two days later, Mr. Steele and Ireland met at Mr. Steele's request. Mr. Steele apologized for his conduct at the department meeting and then told Ireland that hourly shop workers were dissatisfied with company policies. Mr. Steele told Ireland that "management needed to just sit down with the hourly employees and work some things out." Id. at 37-38. Ireland replied, "[T]hat could not be done." Id. at 38. Mr. Steele then told Ireland that, if they could not sit down and discuss these problems, he would organize a union. Ireland asked Mr. Steele to wait until Ireland returned from his vacation to discuss the issue further. Mr. Steele agreed and made no effort to contact a union while Ireland was away.

On August 16, 1996, Mr. Steele met with Ireland and bindery department manager Marty Heathcoat in Heathcoat's office. During this meeting, the two managers asked Mr. Steele why he would want to bring a union into the company. Mr. Steele told them that it would be nice to have seniority rights, better working conditions, and raises when possible. Ireland then asked what Mr. Steele could do to improve Mr. Steele's own situation at the company and pointed out that Multi-Ad posted job openings. After Mr.

Steele expressed interest in a maintenance position, Ireland told him that he would set up an interview, even though the company did not have an opening for a maintenance position. At the end of the meeting, Ireland asked Mr. Steele "what it would take to satisfy him." Id. at 39. Mr. Steele replied that it would satisfy him if management "would sit down with the hourly employees and work something out." Id. at 39-40. After Ireland responded that he could not do that, Mr. Steele informed the two managers that he was leaving the meeting and was going to attempt to organize a union. Ireland asked Mr. Steele to come back and talk some more, but Mr. Steele responded that there was nothing left to talk about. Mr. Steele left at 3:30 p.m., 30 minutes after his shift had ended. No one told Mr. Steele to stay nor was he reprimanded for having left the meeting. The next day, Mr. Steele interviewed for a maintenance position, but the interview revealed that he lacked the necessary qualifications. In any event, Mr. Steele said that he did not want the job.

Mr. Steele twice met with union officials in late August. During this time, employees began to talk about Mr. Steele's efforts at organizing a union. At a meeting of bindery department employees in late August, Heathcoat addressed rumors about a union and asked employees why they wanted a union. In response, Mr. Steele stated that everyone knew that Heathcoat was referring to Mr. Steele's desire to look into unionization. Ted DeRossett, Mr. Steele's supervisor, then warned that the bindery department would be the "first to go" if the company unionized. Id. at 80. Mr. Steele immediately challenged the legality of closing the bindery department in such a fashion. After Mr. Steele and DeRossett began to argue heatedly, Heathcoat ended the meeting.

At another bindery department meeting in late August, management informed employees that they would be working mandatory 10-hour shifts. Mr. Steele protested that it was unfair to require employees to work overtime when in the past they had been able to decline overtime. Mr. Steele also stated that it was decisions like this that caused him to explore bringing in a union.

Shortly after the meeting, Multi-Ad announced that it was adding a second shift in the bindery department and that Mr. Steele would be the lead man. On August 29, 1996, Heathcoat and DeRossett asked Mr. Steele if he would work the second shift with a positive attitude. The two assured Mr. Steele that he could still take his scheduled vacation days from August 30 through September 3. Mr. Steele told them that he would go to the second shift, do the job, and represent the company as was expected of him.

The next day, while Mr. Steele was on vacation, Multi-Ad received a letter from Mr. Steele requesting copies of the company's policies and bylaws. When Mr. Steele returned from his vacation on September 4, Heathcoat and DeRossett were waiting for him at the plant's garage door. The two asked Mr. Steele if he still wanted to see the materials that he had requested in the letter. Mr. Steele said yes, and the two told him that he could pick up the materials in the office of Bruce Taylor, Multi-Ad's vice president of finance. Mr. Steele punched the time clock and, as he started to walk toward Taylor's office, noticed DeRossett and Heathcoat accompanying him. Mr. Steele told them that he did not need them to pick up the papers. The two replied that they were tagging along in case he had any questions. Mr. Steele told them that he could not possibly have any questions because he had not yet read the materials. Nevertheless, both managers followed Mr. Steele into Taylor's office. Ireland entered the office shortly thereafter.

Mr. Steele first asked Taylor for the documents. Taylor replied that Mr. Steele already had been given the summary statement at the quarterly meeting. Mr. Steele responded that he was not asking for a summary but for complete documents. After again requesting the documents and receiving no response, Mr. Steele announced that he would no longer participate in the meeting and walked out. Heathcoat ordered him to remain or be fired. Mr. Steele ignored this command and walked back to the plant, pursued by Heathcoat and Ireland. Heathcoat repeated his order that Mr. Steele return to the office or be fired. Mr. Steele, again, refused. Ireland then told Mr. Steele that "this is the third meeting you have

walked out of, you are gone." Id. at 171. Mr. Steele immediately demanded a termination letter.

Even though Ireland had made the decision to fire Mr. Steele, Heathcoat prepared the letter. The letter spells out the purported reasons for Mr. Steele's termination:

He [Mr. Steele] said that he didn't come here for a meeting., [sic] and then walked out of the room. I told him to get back in Bruce's [Taylor's] office to discuss this with us. He repeated himself again saying that he didn't want a meeting. Jerry Ireland then Fired [sic] him.

Ted Steele has walked out of three meetings within a month because he didn't feel like hearing what was being said to him. He has said that he does not agree with corporate policies set for all the employees of Multi[-]Ad. He has interrupted the work flow of the Bindery Department by persuading it's [sic] employees that this is not a good place to work. Ted will never see eye to eye with Multi[-]Ad's policies and goals for it's [sic] employees and will not even conduct himself in a professional manner when talking to management about his concerns. Ted is terminated on 9-4-96 because of his unwillingness to abide to [sic] corporate policies.

Vol. 3, Ex.GC-2. Ireland testified that he fired Mr. Steele because he was totally disrespectful to management. Ireland also testified that Mr. Steele's exit from the meeting on September 4 was an act of insubordination, particularly after he ignored Heathcoat's order to return.

B.  The Administrative Proceedings

On September 26, 1996, Graphic Communications Union, Local 68C, and Graphic Communications International Union, AFL-CIO, filed an unfair labor charge against Multi-Ad on behalf of its employees, including Mr. Steele. Soon thereafter, the Board's General Counsel issued a complaint and a notice of hearing under 29 U.S.C. sec. 160(b). Thecomplaint alleged that Multi-Ad violated sec. 8(a)(1) of the Act by (1) coercively interrogating Mr. Steele about

his interest in forming a union during the August 16 meeting with Heathcoat and Ireland; (2) impliedly promising at the August 16 meeting to help Mr. Steele improve his employment situation without the need for representation; and (3) threatening to close the bindery department if its employees unionized. The complaint also alleges that Multi-Ad violated sec.sec. 8(a)(1) and (3) of the Act by discharging Mr. Steele because it believed that he might contact a union to organize employees.

On May 29, 1997, the Administrative Law Judge (ALJ) conducted a hearing on the Board's complaint. Based on the evidence presented at the hearing, the ALJ issued his decision on December 2, 1997, and found that Multi-Ad had committed the charged unfair labor practices. On August 25, 2000, the Board, after reviewing exceptions filed by Multi-Ad, issued a decision and order affirming the ALJ's rulings, findings, and conclusions. One member of the panel, however, dissented in part, concluding that Multi-Ad did not coercively interrogate Mr. Steele and did not make an implied promise in violation of sec. 8(a)(1). The Board's order requires Multi-Ad to cease and desist from these unfair labor practices, to offer Mr. Steele reinstatement with back pay, to remove all references to the discharge from its records, and to post a remedial notice.

On October 10, 2000, Multi-Ad filed this petition for review under 29 U.S.C. sec.sec. 160(e) and (f), which confer jurisdiction upon this court. On November 1, 2000, the Board filed a cross-application for enforcement of its order.

II

DISCUSSION

A. The Board's Motion to Strike Portions of Multi-Ad's  Reply Brief

As a preliminary matter, we first address the Board's request to strike portions of Multi-Ad's reply brief. Multi-Ad contends for the first time in its reply brief that the ALJ made three errors: (1) he made improper witness credibility determinations; (2) he demonstrated bias and hostility against Multi-Ad; and (3) he made improper

inferences based on witnesses' failure to testify regarding the meetings held on July 29 and August 16. It is well-settled that parties may not raise new arguments or present new facts for the first time in reply. See Fed. R. App. P. 28(c); Sims v. Mulcahy, 902 F.2d 524, 536 n.5 (7th Cir. 1990). Multi-Ad did not make these specific arguments in its opening brief, and, therefore, these claims are not properly before this court. Consequently, the Board's motion to strike is granted.

B.   Standard of Review

The standard governing our review of unfair labor practice proceedings before the Board is well-established. We shall affirm the Board's decision if its factual findings are supported by substantial evidence and its legal conclusions have a reasonable basis in law. See 29 U.S.C. sec. 160(e); Great Lakes Warehouse Corp. v. NLRB, 239 F.3d 886, 889 (7th Cir. 2001). Substantial evidence in this context means such relevant evidence that a reasonable mind might accept as adequate to support the Board's conclusion. See Beverly Cal. Corp. v. NLRB, 227 F.3d 817, 829 (7th Cir. 2000), petition for cert. filed, 69 U.S.L.W. 3674 (U.S. Apr. 9, 2001) (No. 00-1563). Consequently, as long as substantial evidence in the record supports the Board's opinion, it is irrelevant if evidence also exists in the record supporting Multi-Ad's view of the case. See id. at 830. This court defers particularly to the Board's findings regarding the witnesses' credibility, which cannot be disturbed absent extraordinary circumstances, such as clear bias by the ALJ, utter disregard of sworn testimony, or acceptance of testimony that on its face is incredible. See NLRB v. Gerig's Dump Trucking, Inc., 137 F.3d 936, 941 (7th Cir. 1998). Moreover, where two versions of the same incident materially conflict, an ALJ's credibility determinations are entitled to deference. See Van Vlerah Mech., Inc. v. NLRB, 130 F.3d 1258, 1263 (7th Cir. 1997). This deferential standard of review is appropriate in light of Congress' intent to confer upon the Board broad authority to develop and oversee national labor policy. See Uniroyal Tech. Corp., Royalite Div. v. NLRB, 98 F.3d 993, 998 (7th Cir. 1996). Thus, Multi-Ad faces a difficult task in seeking to

overturn the Board's decision.

C.  Applicable Legal Standards

Section 7 of the Act, 29 U.S.C. sec. 157, guarantees employees the right to self-organization by forming, joining, or assisting labor organizations. See Van Vlerah, 130 F.3d at 1262. The Board concluded that Multi-Ad's actions violated sec.sec. 8(a)(1) and (a)(3) of the Act. Section 8(a)(1) protects the right to self-organization by prohibiting employers from interfering with, restraining, or coercing employees in the exercise of their right to form a union. See Great Lakes Warehouse, 239 F.3d at 890. It is therefore an unfair labor practice to threaten an employee with shop closure or discharge or to interrogate coercively an employee in order to discourage union activities. See Van Vlerah, 130 F.3d at 1262. An employer also violates sec. 8(a)(1) by offering benefits to potential union supporters to prevent them from exercising the right to unionize. See Great Lakes Warehouse, 239 F.3d at 890. In deciding whether an employer's conduct is forbidden by the Act, we must determine whether that conduct reasonably tended to interfere with or coerce employees exercising their protected rights. See Van Vlerah, 130 F.3d at 1262. The words used by the employer, as well as the context in which they were conveyed, must be examined. See id. at 1262-63. In determining what an employee reasonably might have inferred from a communication, the Board must consider the employee's economic dependence on the employer and that employee's concomitant tendency to pick up intended implications that might be more readily dismissed by a more disinterested ear. See id. at 1263.

Section 8(a)(3) makes it an unfair labor practice for an employer to discourage union activity by discriminating against employees with regard to hire or tenure of employment. See id. In evaluating an allegation under sec. 8(a)(3), the Board must ascertain the employer's motivation in taking a particular action. See id. This determination often must be based on circumstantial evidence. See id. When an employee's statutorily protected activity motivated a discharge, a violation has been established unless the employer demonstrates that it would have taken the

same action in the absence of the employee's protected activity. See id. We shall not displace the Board's choice between two permissible views of the evidence, even though we may have decided differently had the matter been before us de novo. See id.

D.  Substantial Evidence

Multi-Ad argues that the Board's conclusions are not supported by substantial evidence./1 Multi-Ad, however, cannot overcome the deferential standard of review that we must afford the Board's conclusions. Multi-Ad first challenges the Board's determination that Multi-Ad coercively interrogated Mr. Steele on August 16 in violation of sec. 8(a)(1) of the Act. Whether an employer's questioning of an employee is coercive depends on the factual context in which the questioning occurs. See NLRB v. Joy Recovery Tech. Corp., 134 F.3d 1307, 1313 (7th Cir. 1998). The test is not whether coercion actually occurred, but only whether the employee perceived the employer's actions to be coercive. See Great Lakes Warehouse, 239 F.3d at 890. Factors that ought to be considered in deciding whether a particular inquiry is coercive include the tone, duration, and purpose of the questioning, whether it is repeated, how many workers are involved, the setting, the authority of the person asking the question, and whether the company otherwise had shown hostility to the union. See NLRB v. Champion Labs., Inc., 99 F.3d 223, 227 (7th Cir. 1996). We also consider whether questions about protected activity are accompanied by assurances against reprisal and whether the interrogated worker feels constrained to lie or give noncommittal answers rather than answering truthfully. See id.

Substantial evidence supports the Board's conclusion that management coercively interrogated Mr. Steele on August 16. The closed-door meeting was conducted in a manager's office by Heathcoat and Ireland, two people who had authority to fire Mr. Steele. The two managers questioned Mr. Steele regarding why he would want to bring a union into the company. See Beverly Cal. Corp., 227 F.3d at 835 (holding that an employer may not probe directly or indirectly into an employee's reasons for supporting a

union). Moreover, Ireland immediately thereafter asked Mr. Steele about his own career advancement and arranged an interview for a maintenance position, even though no such opening existed. The managers did not assure Mr. Steele that reprisals would not be taken against him for his answers, adding to the potentially coercive nature of the inquiry. Further, this meeting was conducted after company managers had expressed uneasiness over union activity. These circumstances are more than enough evidence to sustain the Board's findings.

Multi-Ad next challenges the Board's finding that it made an implied promise of benefits by asking Mr. Steele how he could help his own situation and by arranging the job interview. An employer violates the Act when it interferes with the employees' exercise of their rights to organize by soliciting grievances when such solicitation is accompanied by implied promises of benefits specifically aimed at deterring union activity. See 6 West Ltd. v. NLRB, 237 F.3d 767, 782 (7th Cir. 2001). Here, Ireland asked Mr. Steele why he wanted to form a union and then asked Mr. Steele how Mr. Steele could improve his own situation. Mr. Steele expressed an interest in a maintenance position, and Ireland arranged for an interview immediately, even though there were no such openings. The context in which this occurred is significant. Because the managers made this overture during a conversation about the need for a union, the Board reasonably could have concluded that the company was willing to confer a benefit to deter Mr. Steele from contacting a union. Thus, given the circumstances in which the managers discussed Mr. Steele's career advancement, substantial evidence supports the Board's conclusion that Ireland's remarks constituted an implied promise of benefits to dissuade Mr. Steele from contacting a union.

Next, Multi-Ad argues that substantial evidence does not support the Board's conclusion that Multi-Ad threatened to close the bindery department. Unlike an interrogation, which is coercive only if reasonable employees would perceive it as such, a threat of plant closure is per se a violation of sec. 8(a)(1). See Champion Labs., 99 F.3d at 228. In this case, three employees testified unequivocally

that DeRossett said that the bindery department would be the "first to go" if they brought in a union, and this evidence is more than sufficient to establish a violation.

Finally, Multi-Ad disputes the Board's conclusion that Mr. Steele's discharge violates sec.sec. 8(a)(1) and (3). An employer violates sec.sec. 8(a)(1) or (3) of the Act by firing employees because of their union activities. See Vulcan, 219 F.3d at 684. To prove a violation, the Board must prove that anti-union animus was a substantial or motivating factor in the employer's decision to make the adverse employment decision. See id. If the Board proves such a motivation by a preponderance of the evidence, the employer can avoid a finding of an unfair labor practice by showing that it would have taken the action regardless of the employee's union activities. See id. But the employer need not establish this affirmative defense until the Board has met its burden. See id.

To establish that anti-union animus was a substantial or motivating factor in a discharge, the Board must demonstrate that (1) the employee engaged in union activities; (2) the employer knew of the employee's involvement in protected activities; (3) the employer harbored animus toward those activities; and (4) there was a causal connection between the employer's animus and its decision to discharge. See id. The Board may rely upon direct or circumstantial evidence. See id.

Multi-Ad challenges only the third element, but substantial evidence supports a finding that the company harbored animus, including (1) the timing of Mr. Steele's firing, which coincided with his increased efforts to organize a union, see Great Lakes Warehouse, 239 F.3d at 891 (timing of discharge is appropriate factor to consider in determining whether there was a violation); (2) the coercive interrogation of Mr. Steele regarding his interest in forming a union; (3) management's questioning of other employees about their interest in forming a union; and (4) DeRossett's warning that the bindery department would close if employees unionized. Thus, the Board met its burden of establishing anti-union

animus.

Multi-Ad claims as an affirmative defense that it fired Mr. Steele for leaving three meetings without permission. The Board concluded, however, that Multi-Ad's proffered reason was pretextual and that the company fired Mr. Steele because of his efforts to unionize. That conclusion is supported by substantial evidence, including (1) Multi-Ad's written explanation of termination stating a different reason-- that he was discharged because he refused to abide by corporate policies; (2) the September 4 encounter was not a "meeting"--Mr. Steele entered the office to pick up materials to which he was legally entitled and twice denied access; and (3) no manager instructed Mr. Steele to remain at the previous two meetings, both of which occurred after shift hours. Thus, substantial evidence supports the Board's conclusion that Multi-Ad fired Mr. Steele because of his union activity and that its stated reasons for doing so were pretextual.

Conclusion

Because the determination of the Board is supported by substantial evidence, the petition for review is denied, and the order of the Board is enforced.

PETITION FOR REVIEW DENIED;
ORDER ENFORCED

FOOTNOTE

/1 Multi-Ad is correct that the ALJ at times relied on the "missing witness" rule in evaluating the credibility of witnesses. The rule provides that when a party can call a witness to shed light on an event, but chooses not to, an inference arises that the witness' testimony, if produced, would be unfavorable. See Chicago College of Osteopathic Med. v. George A. Fuller Co., 719 F.2d 1335, 1353 (7th Cir. 1983). This court is skeptical of the rule and will not accept assumptions made by the ALJ based on a witness' failure to testify. See Vulcan Basement Waterproofing of Ill., Inc. v. NLRB, 219 F.3d 677, 681 n.5 (7th Cir. 2000); see also NLRB v. Louis A. Weiss Mem'l Hosp., 172 F.3d 432, 445-46 (7th Cir. 1999). This skepticism is based on this court's observation that an absence of evidence does not necessarily favor the party bearing the burden of proof on an issue. See Weiss Mem'l Hosp., 172 F.3d at 446. Here, the ALJ's reliance on the absence of wit-

ness corroboration is harmless error. There is clearly sufficient evidence to support the ALJ's conclusions without considering the lack of witness corroboration. Moreover, the Board, in reaching its decision, did not explicitly refer to the failure of available witnesses to testify.