In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-2040 & 00-2289

L.S.F. Transportation, Inc., a/k/a L.S.F.
Trucking, Inc.,

Petitioner/Cross-Respondent,

v.

National Labor Relations Board,

Respondent/Cross-Petitioner.

Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
Nos. 13-CA-33256, 13-CA-33289, 13-CA-33374-2,
13-CA-33385, 13-CA-33417, 13-CA-33511 & 13-CA-33539.

Argued November 29, 2001--Decided March 11, 2002


   Before Coffey, Easterbrook, and Ripple,
Circuit Judges.

   Coffey, Circuit Judge.  This petition
asks us to review whether L.S.F.
Transportation, Inc. (LSF or
company)violated the National Labor
Relations Act, 29 U.S.C. sec. 151 et seq.
by unlawfully terminating employees in
retaliation for their union activity. The
National Labor Relations Board concluded
that LSF violated sec.sec. 8(a)(1) and
(3) of the Act by engaging in an anti-
union campaign of harassment and
intimidation and by discharging seven
employees because it believed they had
taken steps to organize a union to
represent LSF employees. LSF now
petitions for review of the Board's
order, contesting its findings as to four
of the discharged employees; the Board
has filed a cross-application requesting
enforcement of its order. We deny the
petition for review and grant enforcement
of the Board's order.

I.   Factual Background/1
A.   The Union Campaign

   LSF maintains and operates a trucking
operation in Hammond, Indiana, and is
owned and operated by the Faure family,
with Amy Faure serving as its president.

LSF's day-to-day operations are managed by Operations Manager Scott Belt. Other LSF managerial personnel include Craig Crohan, the vice president of operations; Bill Burnson, manager; Jerry Helton, comptroller; and Valerie Day, LSF's dispatcher.

On March 20, 1995, the International Brotherhood of Teamsters, Local 42, AFL-CIO (union) began a campaign to organize LSF's drivers. By the next day, 12 out of 18 LSF drivers had signed petitions authorizing the union to represent them for the purposes of collective bargaining, and on March 22 the union filed a petition requesting a representation election with the NLRB, which was scheduled for April 29, 1995.

LSF was none too thrilled with the possibility of its drivers unionizing and upon learning of the campaign it launched an admittedly unlawful counter-campaign, comprised of both oral and written intimidation coupled with acts of harassment, in an attempt to convince its drivers to reject the union. In the month preceding the election, LSF officials coercively interrogated several employees about their union support and activity. The company interspersed its questions to its employees with threats of plant closure, loss of jobs, discharge and other reprisals. For example, LSF dispatcher, Valerie Day, told employees that President Faure would close down the company if the employees unionized. Operations Manager Belt repeated Day's warning and told one employee that he "did not know how much damage a union could do to the company and that a union at LSF could mean [his] job."

Other reprisals were more tangible. On March 27, 1995, a week after the union campaign had begun, the company revoked its policy of allowing drivers to get cash advances with a company credit card. Two weeks later, the company accompanied the cash order with new, more restrictive, work rules for the drivers. On April 25, Faure issued a letter to employees entitled "What Will Local 142 Bring to the Table," which threatened that wages and benefits would be frozen if the union were selected as their collective-bargaining representative and further advised the employees that they were "gambling with" their wages and

benefits.

The most serious of LSF's reprisals, and those at issue in this appeal, were the adverse actions taken by the company against the employees who had chosen to sign the petition. Seven out of twelve of the employees who signed the petition were terminated by LSF either shortly before or shortly after the April 29, 1995, election. Six of the seven terminated employees also received temporary layoffs or suspensions, work reassignments, or disciplinary warnings shortly before their discharge. LSF now concedes that its pre-election anti-union campaign was unlawful. In addition, LSF no longer disputes that it unlawfully terminated three union supporters (Mark Hasse, Michael Dooley, and Ron Holland) in retaliation for their union activities. LSF does argue, however, that the termination or constructive discharge of four other employees (Dennis Hill, Walter Michaels, William Owens, and John Kawa) did not violate the NLRA.

B.  Dennis Hill

In March 1994, roughly a year before the drivers commenced their union-organizing activity, Dennis Hill suffered a seizure while making a delivery and was hospital ized for two days. Hill's neurologist authorized him to return to work a few days later, on March 14, 1994. Upon returning to work, Hill was advised by the former operations manager that he was required to submit a medical certification to clear him to drive, pursuant to Department of Transportation (DOT) regulations. Hill scheduled a phys ical at the Hammond Clinic that revealed him to be in "good general health," and he received a valid medical certification that allowed him to continue driving for a 2-year period. LSF paid some of Hill's medical bills arising from his hospital stay and subsequent physical examination.

On March 20, 1995, Hill made the initial contact with the union on behalf of the drivers, requesting information regarding union representation. Hill later circulated and signed the petition requesting that the union represent the drivers for purposes of collective bargaining and also frequently wore a union button at work. But on March 21, 1995, immediately after Hill began his

organization efforts, dispatcher Day questioned Hill about his union activity. Among other things, Day warned Hill that Faure would "close the doors" if she found out they were trying to unionize.

A few days after Hill's conversation with Day, LSF reassigned him from driving primarily long-haul runs to short-haul runs, resulting in a drop in Hill's weekly earnings. Around the same time, LSF also transferred other employee's routes from short-haul runs to long-haul runs. Manager Belt then asked Hill to sign a document acknowledging that LSF had advanced him money to cover his 1994 medical expenses and committing Hill to payroll deductions to reimburse it for the medical expenses in the amount of $200/month. Hill refused to sign the document.

On April 12, 1995, LSF informed Hill that it was required to place him on medical leave and directed him to obtain a second medical certification to continue driving. Belt advised Hill that DOT regulations required that he place Hill on medical leave due to his history of seizures, and Belt produced a letter in support from Dr. Feldman, the director of the Hammond Clinic where Hill had received a physical examination and DOT certification the year before. The letter began "[t]o confirm a discussion you had with Kelly from my office this morning, the two drivers in question with the history of seizures and chest pains should not be driving until released to return to work after complete evaluations." The letter failed to mention Hill by name, much less explain why Belt had contacted the clinic in the first instance when Hill had submitted a two-year medical certification a year earlier.

At the conclusion of his meeting with Belt, Hill asked if he would still have a job after this, and Belt responded in the affirmative. Hill began to arrange for a medical examination during the following week. On April 13, Belt telephoned Hill and informed him that he was "a little confused" about how Hill was going to vote in the upcoming election. Hill responded that he had no comment.

On August 7, 1995, several months after the election and while Hill was still on

medical leave, LSF informed Hill to report to work on August 28, 2001, with a current certified DOT license or he would be presumed to have resigned. Hill was unable to secure a medical certification until September 22. After he obtained his certification, Hill chose to work for another employer, rather than return to LSF.

C.  Walter Michaels

Unlike Hill, Walter Michaels worked primarily short-haul runs (those within a 120-mile radius of LSF's facility) since he was hired in 1992. Michaels's preference for making short-haul runs was well known throughout LSF. In November 1994, LSF was awarded a contract to deliver beer within a three-state area and management asked Michaels to agree to make some long-haul runs. Michaels agreed, but only after receiving assurances from Belt and Day that he would be reassigned primarily to short-haul runs when additional drivers were hired to make the long-haul runs generated by the November 1994 contract mentioned above. Michaels made sporadic long-haul runs from November 1994 through January 1995 and then returned to short-haul runs.

On March 20, 1995, Michaels signed the petition for the union. The next day, Day asked him how the meeting had gone, and he responded simply "okay." On March 27, Michaels made a short run and after completing it he returned home. Day telephoned him at home to ask if he would take a long run to Detroit, Michigan that evening. Michaels declined, stating that he had already worked a full day and did not believe that DOT regulations permitted him to drive to Detroit because he had just completed a run earlier in the day. A short time later, Day called Michaels again and asked him to reconsider, and Michaels once again declined. Next Belt asked Michaels to take the run, and when Michaels declined Belt suspended him for two days.

Following his suspension, Michaels went on medical leave to undergo surgery for an inguinal hernia. Shortly after Michaels began his leave, Manager Burnson asked him how he intended to vote in the election, to which Michaels informed Burnson that it was "none of [his]

business." When Michaels returned to work on May 15 just two weeks after the election, LSF dispatched him on three consecutive long-haul runs, despite its knowledge of Michaels's desire to do short-haul runs exclusively, knowledge of Michaels's recent surgery, and Michaels's repeated protests that he desired to be assigned to short-haul runs only. At the time, LSF provided Michaels with no explanation why it reassigned him from short-haul runs to long-haul runs. Upon being informed that his next run would likewise be a long-haul run, Michaels telephoned his wife and they decided that LSF was intentionally assigning him to long-haul runs and that the assignments would continue. Michaels informed Belt that he was quitting because his body could not handle the hours he had been asked to work since his return from medical leave and he did not want to risk an accident.

D.   William Owens

   William Owens began working for LSF as a driver in 1993. Owens's commercial driver's license was a class B license, rather than a class A license, meaning that he was limited to driving straight trucks only and was not licensed to drive tractor-trailers. In December 1994, LSF issued a memorandum advising drivers that they would have to secure class A licenses by January 15, 1995. Owens met with Belt in early January, and Belt assured him that he would not be required to obtain a class A license in order to preserve his job with LSF.

   Roughly two months later, on March 21, 1995, Owens signed the petition in support of the union. While the election was still pending, Owens received a memorandum from the company on May 8, 1995, informing him that he had to secure a class A license by May 19 and that failure to comply would "result in disciplinary action." Given the amount of training required, it would have been impossible for Owens to secure a class A license in 11 days. On May 19, management declined to dispatch Owens without a class A license, and when Owens sought clarification of his status, Belt directed him to return all company equipment, effectively discharging him.

E.   John Kawa

John Kawa began to work for LSF in September 1994, and worked primarily on runs to and from Frank's Nursery and Crafts, which had locations in Indiana, Michigan, and Kentucky. In January 1995, Kawa enjoyed the runs to Frank's and became concerned that other employees might be assigned runs to Frank's. Kawa asked for and received assurance from Belt that he would not be taken off those runs. But on March 22, one day after Kawa signed the union petition, LSF assigned him to a different route and thereafter sharply reduced the number of Frank's assigned runs.

On April 30, the day after the election, Kawa was cited for speeding and given a breathalyser test, which revealed that Kawa had a .009 blood-alcohol concentration (BAC). Kawa received a second citation for having a detectable amount of alcohol on his breath, but did not receive a DUI citation, which requires a .04 BAC. The Michigan officer confiscated Kawa's license to serve as a cash bond to ensure that the fine imposed would be paid. Upon informing Day about the citations, Kawa was told to return to LSF's Hammond facility to meet with Belt.

Belt suspended Kawa pending the return of his license, instructing Kawa to notify him when his license was returned because he would "probably go back to work." Kawa paid his fine and his license was returned around May 18, 1995. On May 23, Kawa was informed by Belt that in light of his citations LSF was required to terminate him.

F. The ALJ's Decision and The Board's Conclusions and Order

In August 1995, the union filed charges against LSF claiming that it had violated sec.sec. 158(a)(1) & (3) & (5) of the NLRA, which prohibits employers from interfering with, restraining, or coercing employee efforts to organize or bargain collectively and discriminate against employees based upon their membership in a labor organization. The union contended that LSF violated the Act when it interrogated and harassed employees regarding their union activity when it imposed more restrictive work rules, and when it discharged seven union supporters. An administrative law judge

(ALJ) held a six-day hearing and both the union and the company presented witness testimony as well as written evidence in support of their respective positions.

The ALJ made extensive findings of fact and issued a 53-page decision. In short, the ALJ found that the company's pre-election campaign of harassment violated sec.sec. 158(a)(1) & (3) & (5) of NLRA and that the terminations of the employees, as well as their changes in assignments or constructive discharge, of Mark Hasse, Ron Holland, Michael Dooley, Dennis Hill, Walter Michaels, William Owens, and John Kawa were in violation of the Act. Much of the ALJ's decision rested upon his findings that discredited the testimony of LSF officials while crediting that of the employees.

LSF appealed the ALJ's decision to the National Labor Relations Board, excepting to the ALJ's determination that its pre-election conduct violated sec. 158(a)(1) and to the determination that its conduct towards Hill, Michaels, Owens, Kawa, and Hasse violated sec. 158(a)(3)./2 The Board affirmed the ALJ's rulings and findings with some modifications not relevant to this appeal, with one member dissenting with regard to the Board's affirmance of the portion of the ALJ's ruling concerning Kawa and Michaels. LSF requests us to review the Board's action in affirming the ALJ.

II. Issues

LSF argues that the Board erred in determining that the company had violated the NLRA with regard to its treatment of and actions toward the active union organizers Dennis Hill, John Kawa, Walter Michaels, and William Owens.

III. Analysis

A. Standard of Review

The standard governing our review of unfair labor practice proceedings before the Board is well-established. We ask only whether the Board's decision is supported by substantial evidence and whether its legal conclusions have a reasonable basis in law. Multi-Ad Services, Inc. v. NLRB, 255 F.3d 363, 370 (7th Cir. 2001). Substantial evidence in this context means such relevant evidence

that a reasonable mind might accept as adequate to support the conclusions of the Board. Id. The presence of contradicting evidence is not of consequence as long as substantial evidence supports the Board's decision. Beverly California Corp. v. NLRB, 253 F.3d 291, 294 (7th Cir. 2001). Further, we defer particularly to the Board's findings regarding credibility, which cannot be disturbed absent extraordinary circumstances. Id. Indeed, we refuse to interfere with the Board's choice between two permissible views of the evidence, even though we may have decided the matter differently had the case been before us de novo. Multi-Ad Serv., Inc., 255 F.3d at 371. This deferential standard of review is appropriate in light of Congress' intent to confer upon the Board broad authority to develop and oversee national labor policy. Id.

Section 8(a)(3) of the Act makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . ." 29 U.S.C. sec. 158(a)(3). An employer violates this provision when it threatens an employee with shop closure or discharge or interrogates an employee coercively in order to discourage union activity. Multi-Ad Serv., Inc., 255 F.3d at 371. Likewise an employer violates this provi sion "'when it purposefully creates working conditions so intolerable that the employee has no option but to resign- -a so-called constructive discharge.'" Canteen Corp. v. NLRB, 103 F.3d 1355, 1365 (7th Cir. 1997) (quoting Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 894 (1984)).

In determining whether an employee's discharge is unlawful under sec. 8(a)(3) of the NLRA the employer's "motivation is paramount." NLRB v. Bestway Trucking, Inc., 22 F.3d 177, 180 (7th Cir. 1994). We employ a burden-shifting framework to determine whether an employer's action and motive in terminating an employee was lawful. Within this framework, once it is shown that an employee's union or protected activity was a motivating factor in the employer's decision to take adverse action against him, the employer then has the burden of demonstrating that "it would have taken the same action even

in the absence of protected activity."
Id.; see also Multi-Ad Serv., Inc., 255
F.3d at 371.

   On appeal LSF challenges the Board's
findings that it discharged (or
constructively discharged) Dennis Hill,
Walter Michaels, William Owens, and John
Kawa. The company does not contest the
remainder of the Board's findings. We
therefore summarily affirm those portions
of the Board's order dealing with LSF's
pre-election conduct and the discharge of
three other employees (Mark Hasse,
Michael Dooley, and Ron Holland).

B.  Dennis Hill

   LSF argues that the Board's conclusion
that it unlawfully discharged Dennis Hill
because of his union activity is not
supported by substantial evidence. The
essence of the company's argument is that
it was required to discharge Hill because
he had "serious medical problems" that
caused his DOT license to "come[ ] into
question." In support, LSF submits that
it received a letter from Dr. Feldman,
its DOT physician, advising it that
drivers with histories of seizures and
chest pain should not be driving until
released to work after complete physicals
and evaluation.

   But the ALJ found and the Board affirmed
that Hill had undergone a physical
examination, at the Hammond clinic where
Dr. Feldman was employed on April 7,
1994, and that the results of the
examination and corresponding clearance
for employment as a driver were valid for
two years. The record reflects that LSF
failed to submit any evidence to suggest
that one year after this examination it
had any valid reason to became genuinely
concerned about Hill's medical status.
Furthermore, it failed to offer any
evidence in support of its implied theory
that Hill's seizures had recurred or
worsened during the course of the
intervening year, much less any
explanation why the medical certification
obtained by Hill one year earlier was
insufficient.
   Further, the ALJ ruled that it was
"firmly convinced that Belt set up the
chain of events which led Dr. Feldman to
unwittingly issue his letter, thereby
providing Belt with an excuse to rid
himself, once and for all, of one of the

union's most ardent supporters. For these reasons, I place no credence in Dr. Feldman's letter." LSF has not devoted even a sentence in its brief to the ALJ's credibility determination, and instead continues to insist without any support in the record that it discharged Hill because he did not have the required medical certification. The Board affirmed the ALJ's findings with regard to Dennis Hill and LSF has failed to offer a scintilla of evidence to suggest any "extraordinary circumstances" that would have warranted setting aside the ALJ's credibility determination finding that Belt was responsible for setting up a chain of events that culminated in Dr. Feldman's letter and the Board's finding of fact that Belt contrived to secure Dr. Feldman's letter in order to provide him with an excuse to terminate Dennis Hill. See J.C. Penney Co. v. NLRB, 123 F.3d 988, 995 (7th Cir. 1997). After review, we agree that the record reflects a substantial amount of evidence in support of the Board's and the ALJ's finding that Belt's sudden concern with Hill's medical status was a pretext to discharge him in retaliation for his union activity.

C.  Walter Michaels

LSF offers a number of explanations for its actions with regard to Walter Michaels./3 Initially, the company argues that Michaels voluntarily chose to resign from his position at LSF and further that he was not constructively discharged. In support, the company argues that Michaels returned to work after hernia surgery on May 15 with a medical clearance that allowed him to work without restriction. LSF suggests that it assigned Michaels to three consecutive long-haul runs between May 15 to May 18 because the number of short-haul runs needed by LSF's customers had decreased.

But Michaels's interest in making only short-haul runs was common knowledge in the company for sometime. Indeed, when Michaels agreed to make infrequent and intermittent long-haul runs from November 1994 to January 1995 (before his union activity) because the company had developed a sudden increase in long-haul runs at that time. He did so only after receiving assurances from management that he would be reassigned to short-haul runs upon the company's hiring of additional

drivers. The company's suggestion that Michaels was amenable to being assigned to long-haul runs simply lacks factual support in the record.

Furthermore, the unusual timing and suspicious circumstances surrounding Michaels's unanticipated and unexpected reassignment to the long-haul runs in spite of his well-known preferences and recent medical problems further suggest that it was done in retaliation for his union activity. For example, LSF's questions towards Michaels regarding his union activity prior to the election can be classified as coercively interrogating. In addition, shortly before the election LSF suspended Michaels for two days after he refused a long-haul assignment (the unlawfulness of which LSF does not challenge in this petition), and in so doing made its intentions clear that it would assign Michaels to long-haul runs regardless of his desire to avoid them. The ALJ further found that when LSF ultimately reassigned Michaels to three consecutive long-haul runs it failed to provide him with any reason for its decision.

LSF argues that Michaels's assignment to long-haul runs only minimally changed the conditions of his employment and that because after his hernia surgery he was medically cleared (May 15) to work without restrictions, its decision to reassign Michaels to long-haul runs could not support a constructive discharge. But there is no question that long-haul runs are certainly more strenuous, taxing, and difficult on the human body and mind and require drivers to spend nights away from home, many sleeping in the cramped compartments of their tractor trailers. See Bestway Trucking, Inc., 22 F.3d at 181. In the past we have found that an employer's sudden reassignment of an employee from short-haul runs to long-haul runs, contemporaneous with anti-union actions or comments made by management, suffices to create an intolerable working condition for the reassigned employee. Id. Accordingly, we agree with the Board that the record contains substantial evidence in support of the ALJ's determination that LSF constructively discharged Michaels.

D. William Owens

LSF insists that it had no choice other than to fire William Owens because of Owens's failure to obtain a class A CDL, which would allow him to operate tractor trailers in addition to straight trucks. But the ALJ found that Belt met with Owens and another LSF employee, Bill Sadler, in January 1995 and assured Owens that "he would protect him from having to get his class A license, and further offered to give him a written statement guaranteeing he would not have to drive a tractor trailer." LSF does nothing to refute the ALJ's finding that Belt assured Owens he would not be required to obtain a class A CDL, and in fact references it in its own argument. Further testimony from Sadler before the ALJ corroborated the conversation between Belt and Owens, and Sadler testified that Owens told Belt that he had "no intentions of getting a class A license" and asked whether he was in danger of losing his job to which Belt responded in the negative.

But on May 8, a mere 10 days after the union election, Owens received a memorandum from Belt advising him that he had but 11 days to obtain the class A license. Owens testified that it would be a practical impossibility to learn the skills and complete the paperwork necessary to obtain a class A license in 11 days. When Owens arrived at work on May 19, 1995 he was informed by Belt that he could not be dispatched on any assignments for LSF without a class A CDL. Owens asked whether he should turn in his LSF equipment, and Belt directed him to do so and his services were terminated.

The ALJ found Owens's testimony that Belt had assured him in January that he need not secure a class A CDL to be credible. The ALJ further found that LSF managers made many anti-union comments to Owens before the election, and that its decision to terminate him 10 days after the union election for failing to obtain a class A CDL was motivated by Owens's union activity. LSF for the first time in this appeal, advances the argument that it had eliminated all of its straight trucks and therefore it had no vehicles that Owens was licensed to drive. We observe, as we have before, that LSF's argument fails once again as required by Circuit Rule 28 to point us to any part

of the record in support of its claim. Furthermore, we observe that according to the record before us LSF never advanced this non-discriminatory reason for Owens's discharge before the Board, and therefore, has waived it. NLRB v. Alwin Mfg. Co., 78 F.3d 1159, 1162 (7th Cir. 1996). In short, LSF fails to make any argument whatsoever as to why we should set aside the ALJ's credibility determinations that support his determination that the company unlawfully terminated Owens. Given the timing of Owens's firing, LSF's knowledge of Owens's union support, and LSF's extensive anti-union tactics, we agree with the Board that LSF terminated Owens because of his union activity.

## E.   John Kawa

Finally, the company argues that it discharged John Kawa for non-discriminatory reasons. On May 1, 1995, two days after the union election, Kawa received two driving citations, one for speeding and one for having a "detectable amount" of alcohol on his breath./4 The police officer made it a point to inform Kawa that he was not being cited for driving under the influence (which required a BAC more than four times greater than Kawa's) and furthermore that the citation for having a detectable amount of alcohol would not be reflected on his driving record.

LSF placed Kawa on suspension, pending "further investigation," while he awaited the return of his license, which had been seized as bail bond at the time he was issued citations. Several LSF administrators assured Kawa that he would return to work when he received his license. On May 23, 1995, more than three weeks after the citations were issued, LSF decided to discharge Kawa, allegedly because of his citation three weeks earlier for having a detectable amount of alcohol on his breath when operating a company vehicle. According to LSF, its attorney advised it that it would be in violation of DOT regulations if it were to allow Kawa to continue driving, and thus it had no alternative but to discharge him. But we are unable to discern any such requirement among the regulations. The DOT regulations only provide for the disqualification of a driver who drove with an alcohol

concentration of .04 percent or more, and we are confident that they certainly did not direct LSF to fire John Kawa for having a BAC of .009. 49 C.F.R. sec. 391.15 LSF's continued erroneous insistence that it was merely following DOT regulations when it terminated Kawa, without displaying any letter much less policy or regulation mandating it, has further cast doubt upon the credibility and legitimacy of its explanation.

The ALJ found that LSF discharged Kawa because of his union activity, and not because of the two citations referenced above. The ALJ also noted that LSF never explained why it waited more than three weeks after the citations were issued to discharge Kawa if they were the true reason for his discharge. The ALJ also ruled that Belt's testimony regarding LSF's reasons for terminating Kawa were less than truthful for Belt never did explain why in the first instance he assured Kawa that he could return to work once he regained his license and three weeks later terminated him because of the citations. Accordingly, the ALJ found that the employer's proffered reason for firing John Kawa, that he had consumed alcohol prior to drinking, was false. As we have stated, an employer's proffering of a false explanation for its actions justifies an inference that its real motive for a discharge was unlawful. See Jet Star, Inc. v. NLRB, 209 F.3d 671, 678 (7th Cir. 2000). LSF never even attempted to rebut the ALJ's findings, much less offer a non-discriminatory reason for its firing of John Kawa. Instead it only continues to adhere to its red-herring argument and insists (erroneously) that the DOT regulations required that they terminate Kawa because of his citations.

IV. Conclusion

LSF has done little and failed to call into question the validity of the Board's order. Instead, they have simply repeated the same arguments that they raised (and which the ALJ discredited) before the ALJ. It is not sufficient that we might have arrived at a different conclusion than the ALJ if we reviewed the evidence in the first instance. Rather, LSF must establish that the ALJ's and the Board's conclusions are not supported by substantial evidence. They have not. LSF's petition for review is denied and

we grant enforcement of the Board's
order.

FOOTNOTES

/1 We pause briefly to bring to petitioner's atten-
tion Federal Rule of Appellate Procedure 28(a)
(7), which requires a party's statement of facts
to contain appropriate references to the record
and Circuit Rule 28(c), which provides in rele-
vant part that "[n]o fact shall be stated in this
part of the brief unless it is supported by a
reference to the page or pages of the record or
the appendix where that fact appears." Appellant
has failed to comply with these rules, providing
but five (5) citations to the record in the
entire six page statement of facts. Further,
appellant has referenced evidence (without cita-
tion) that was explicitly excluded by the admin-
istrative law judge, which exclusion it did not
except to before the Board. Fed. R. App. P.
28(a)(7) and Circuit Rule 28(c) are essential to
meaningful judicial review, and we caution peti-
tioner and counsel that they should not "expect
the court to peruse the record without the help
of pinpoint citations." Day v. Northern Indiana
Pub. Serv. Corp., 164 F.3d 382, 384 (7th Cir.
1999). We further caution counsel that violations
of Fed. R. App. P. 28(a)(7) and Circuit Rule
28(c) in the future very well could lead to the
brief being stricken, summary affirmance, togeth-
er with other sanctions. See id.

/2 LSF excepted to other portions of the ALJ's
decision and order that it no longer presses in
its petition for review before this court.

/3 LSF once again in violation of Circuit Rule 28
refers to, without any citation to the record, a
drug screen that it received after Michaels's
constructive discharge. But the company had no
knowledge of the screen until after the relevant
events, and thus the ALJ explicitly disallowed
any reference to it. LSF failed to except to the
ALJ's decision to the Board and cannot now raise
this argument in its appeal.

/4 Kawa's blood-alcohol concentration (BAC) was .009
percent, well under the statutory limit of .04
percent.