# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-1044

INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL 150, AFL-CIO,

*Petitioner*,

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent*,

and

BRANDT CONSTRUCTION COMPANY,

*Intervening Respondent*.

Petition for Review of an Order
of the National Labor Relations Board
Nos. 33-CA-12420, 33-CA-12686 & 33-CA-12942

ARGUED SEPTEMBER 27, 2002—DECIDED MARCH 28, 2003

Before POSNER, RIPPLE, and MANION, *Circuit Judges*.

MANION, *Circuit Judge*. The International Union of Operating Engineers, Local 150, AFL-CIO, filed three unfair labor practice charges against Brandt Construction Company, alleging that the company: (1) changed, limited, and made more onerous its hiring practices and proce-

dures with the purpose of making it more difficult for applicants with pro-union sentiments to apply or obtain employment; (2) refused to hire or consider hiring individuals with pro-union sentiments; and (3) maintained a policy of giving preference in hiring to referral applicants over walk-in or unknown applicants with the purpose or intended effect of making it more difficult for applicants with pro-union sentiments to be considered for employment. The General Counsel of the National Labor Relations Board issued complaints on the charges, and a consolidated hearing was held before an administrative law judge. The ALJ concluded that, although Brandt had engaged in some unfair labor practices, the company had not refused to hire or consider hiring pro-union applicants on account of their union affiliation. A three-judge panel of the National Labor Relations Board affirmed the ALJ's decision, and the union filed a petition for review of the Board's order, which we deny.

## I.

Brandt Construction Company ("Brandt"), a highway contractor located in Milan, Illinois, is engaged in the business of road construction; bridge building; concrete paving; asphalt, sewer and water utility work; and demolition work.[1] The company conducts its business within a 50-mile radius of the Quad City, Illinois area,[2] and has been in existence for over forty years. Since at least 1994, Brandt

---

[1] The background summary contained in this section of the opinion is based on the findings of fact made by the ALJ, which were affirmed by the Board *in toto*.

[2] Brandt is an employer within the meaning of Section 2(2), (6)-(7) of the National Labor Relations Act, 29 U.S.C. § 152(2).

has followed a set hiring policy. Under this policy, Brandt gives preferential treatment to employment applications filed by current and former employees, as well as individuals referred by current supervisors or employees, over unknown or walk-in applicants. Brandt also gives preferential treatment to applicants referred by equal employment opportunity service providers pursuant to a conciliation agreement that it entered into with the U.S. Department of Labor on March 19, 1997 ("DOL Agreement").[3] The company attempts to fill any open positions with these "preferred" applicants before it will even consider an application filed by an unknown or walk-in job applicant. Brandt established, and has maintained, this preferential hiring policy as a means by which to better assess the caliber of prospective employees.

Brandt's preferential hiring policy allows referral candidates to apply with the company at any time without an appointment, but only permits unknown or walk-in applicants to submit employment applications when the company is hiring and even then only on Mondays. The company instituted the "Mondays only" rule (also in 1994) for efficiency reasons and to dissuade individuals receiving unemployment compensation from coming into the office and submitting employment applications solely for the purpose of proving that they were attempting to obtain full-time employment, i.e., in order to receive unemployment compensation.

On January 1, 1997, Brandt placed a sign on its front office door indicating that it only accepted employment

---

[3] This agreement required Brandt to, among other things, make efforts to increase the percentage of women and minorities on each job in order to comply with federal, state, and local equal employment opportunity rules and regulations.

applications on Mondays, replacing a similarly worded sign that had been used by the company since the mid-1990's. When Brandt posted the "Mondays only" sign it meant that the company was currently hiring. If the company was not distributing employment applications, the Mondays only sign would be replaced by another sign advising: "We are not accepting applications."

In February 1997, Brandt amended its hiring policy to require all job applicants not hired within fourteen days of submitting an application to reapply if they were still interested in working for the company. Brandt instituted the fourteen-day rule to ensure that Terry Brandt could immediately locate the applicant laborers, who, in the construction industry, are often needed on short notice.

In late February or early March 1997, Brandt memorialized its hiring policy in writing and posted it on the company's employee bulletin boards. The policy stressed that the company "only accepts employment applications on Monday," and that applications would only be "considered current for a period of two weeks. . . . After fourteen days the employment application expires and any individual interested in employment must complete a new application, if they are being accepted. . . . We do not accept employment applications when we are not hiring." The policy further provided that Brandt "rigorously follow[s]" a procedure of preferring, in descending order, the following types of job applicants: "(a) Current employees of the company; (b) Past employees with proven safety, attendance and work records; (c) Applicants recommended by supervisors; (d) Applicants recommended by current [non-supervisory] employees; and (e) unknown [e.g., walk-in] applicants." Brandt posted the policy to promote the efficiency of its office staff, and to stay in compliance with the DOL Agreement. As in the past, Brandt's limitations on accepting

applications—i.e., on Mondays when the company is hiring—only applied to unknown or walk-in applicants.

At all times relevant to this litigation, Brandt accepted applications from current and former employees, individuals referred by current supervisors and employees, and equal employment opportunity service providers.[4] The company also received applications from unknown or walk-in applicants in 1997, but none in 1998. Upon receiving an employment application, Terry Brandt, the company officer in charge of hiring, would place it in a file according to the trade classification for which he would hire that applicant—e.g., operator, laborer, truck driver or flagger. When Mr. Brandt needed to fill a position for the company, he would pull out the folder for that particular job classification and examine the applications then on file. In January and February 1997, Brandt received approximately twelve employment applications (seven walk-ins and five referrals) but hired none of them. In March 1997, the company received approximately twenty-eight applications, hiring two of the twelve referred candidates and none of the sixteen walk-in candidates.

On April 10, 1997 (Thursday), the International Union of Operating Engineers, Local 150, AFL-CIO ("Local 150" or "union"),[5] at a regularly scheduled meeting, announced

---

[4]   Brandt received minority referrals from Irving Jackson of the Springfield Urban League, who also worked with various unions, and from Tom Cayson of the Illinois Engineer Coordinators Committee ("IECC"). The IECC is associated with the International Union of Operating Engineers and is a member of each "union local" in the State of Illinois. Brandt has hired referrals from each of these organizations.

[5]   Local 150 is a labor organization within the meaning of Section 2(5) of the NLRA, 29 U.S.C. § 152(5), and represents heavy

(continued...)

that Brandt had recently been awarded a large job on Interstate 74, and would, therefore, probably need to hire additional workers for the project. Accordingly, Local 150 decided to send a number of its members to Brandt's office the next day to request and submit employment applications. Before doing so, however, the union scheduled an early morning meeting to instruct participating members on how to fill out Brandt's employment application. The union instructed participating members to wear union hats or other insignia to Brandt's office, and to be polite throughout the application process. The union members were also instructed to indicate on their applications that Local 150 had referred them for the express purpose of organizing the company, and to note that they were applying for operator, laborer, truck driver, or flagger positions with open salary requirements.

On April 11, 1997 (Friday), a total of eleven union-affiliated applicants, all donning union insignia, went to Brandt's business office seeking to fill out job applications. The first group of five pro-union applicants arrived at Brandt's office at approximately 8:30 a.m. The individuals in this group claim that they did not see any signs posted on the front door or inside the office informing walk-in job applicants that the company only accepted employment applications on Mondays. Once they were inside the office, all five received, completed, and filed job applications with the company. An hour later, two more union-affiliated applicants arrived at Brandt's business office. Both applicants observed the company's "Mondays

---

[5] (...continued)
equipment operators and other employees working in the construction industry throughout Northern Illinois, Northern Indiana and parts of Iowa.

only" sign prior to entering the office. After entering the office, the applicants requested and received job applications. The receptionist would not, however, allow them to submit their applications for consideration, advising them that the company only accepted applications on Mondays. A third group of four pro-union applicants arrived at Brandt's office around 11:30 a.m. They also observed the "Mondays only" sign before entering the office. Upon entering the reception area, the applicants were met by a Brandt employee who told them that they could not fill out employment applications because the company only distributed applications on Mondays.

On April 14, 1997 (Monday), approximately fifteen union-affiliated applicants, all sporting union insignia, went to Brandt's business office to fill out job applications. This group of applicants included the union members who had been given applications by Brandt the preceding Friday (April 11th) but were prohibited from turning them in, as well as the other applicants who, that same day, were not given applications at all. Each of the individuals in this group observed the "Mondays only" sign prior to entering Brandt's business office, and, once inside, were permitted to obtain, fill out, and submit employment applications.

On April 21, 1997 (Monday), a group of approximately sixteen union-affiliated applicants arrived at the Brandt's office wearing union insignia and seeking to fill out employment applications. Before entering the office, however, the prospective applicants saw, in addition to the "Mondays only" sign, a sign indicating that prospective applicants would be required to present photo identification in order to receive job applications. Upon entering the office, the group was told by the company's receptionist that such identification was mandatory. Four of the

sixteen applicants did not have photo identification, and therefore were not given applications to fill out. One of the applicants returned later that day with proper identification, and then received, completed, and filed an application with the company.

All of the aforementioned union-affiliated applicants indicated on their applications that Local 150 had referred them specifically for the purpose of organizing the company, and several of them also listed union business agents as personal references. After reviewing the employment history of these applicants, Terry Brandt categorized most of them as prospective candidates for an "operator" position.

In April 1997, Brandt also received, in addition to the applications filed by the union-affiliated applicants, applications from approximately thirty-two referred applicants (including five minority referrals), as well as twenty applicants from other walk-in candidates. Of those applications, the company hired eight of the referred candidates, including three of the five minority referrals. A ninth hire, Angela Smith, was a pro-union applicant who listed Union Local 309 as having referred her for employment. Unlike other union-affiliated applicants, however, Smith attended and completed a flagger training class held by the company and sponsored by the Springfield Urban League.

On May 1, 1997, Brandt took down the "Mondays only" sign and replaced it with a new sign advising prospective walk-in job applicants that: "[the company] is currently not distributing nor accepting employment applica-

tions,"[6] which meant that the company was not currently hiring. As previously noted, however, this limitation only applied to walk-in or unknown applicants, not to current employees, former employees, or applicants referred by EEO service providers.

On May 6, 1997, the union-affiliated applicants who had applied for employment with Brandt the preceding month, as well as other walk-in applicants with no union affiliation, received letters from the company thanking them for their recent interest in employment, notifying them that their applications would remain on file for fourteen days, and advising them that if they wanted to be considered for employment after that time period they would need to file new applications.

On May 9, 1997, several of the union-affiliated applicants who had previously applied with Brandt in April returned to the company's business office seeking to fill out new employment applications. Prior to entering the office, the applicants observed the sign indicating that the company was not currently distributing or accepting applications. Nevertheless, the applicants went inside the office and requested new employment applications. The company declined to provide them, referring the applicants to the sign on the front of its office door. During the visit to Brandt's office, one of the union applicants observed a Hispanic individual filling out an application.

On May 10, 1997 (Saturday), Brandt held a mandatory meeting with its employees. At the meeting, Irwin Brown, a labor relations consultant, spoke to the assembled employees about labor relations, the pros and cons of unions,

---

[6] The ALJ noted that the May 1, 1997 sign "has remained continuously posted up to and including the subject hearing."

and showed a fifteen-minute video about union organized employees. Sometime thereafter, Terry Brandt informed the employees that the company "was no longer handing applications out over the counter" because it knew that Local 150 was trying to "salt" (i.e., organize) its workforce.

During May 1997, Brandt received nine applications from referrals, of which it hired eight. In June 1997, the company received nine applications from referrals, hiring eight of them. Finally, one referred candidate started work in October of that year. From April 1, 1997 through December 31, 1997, Brandt hired twenty-nine employees, twenty-eight of whom were referrals, from a pool of sixty seven referral applicants.[7] Angela Smith, a pro-union applicant, was the only non-referred applicant who obtained employment with the company that year. Moreover, all of the individuals hired by Brandt in 1997 were offered employment within 14 days of the date their applications were filed with the company.[8]

On October 9, 1997, Local 150 filed unfair labor charge number 33-CA-12420 against Brandt, which, as amended, alleged that, since April 11, 1997, the company changed, limited, and made more onerous its hiring practices and

---

[7] Three of the individuals hired by the company filed their applications with the company prior to Local 150's salting campaign, which actively began on April 11, 1997.

[8] More specifically, between mid-April and early May (i.e., the time period that the pro-union applications were valid under the fourteen day rule), Brandt only hired three laborers, choosing from a significant pool of referral applicants, and did not hire any operators, the job most of the pro-union applicants were categorized for by the company.

procedures with the purpose of making it more difficult for applicants with pro-union sentiments to apply or obtain employment, thereby violating Section 8(a)(1) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 158(a)(1). The charge also alleged that Brandt violated Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), by refusing to hire or consider hiring union members for employment. On January 30, 1998, the Regional Director issued and served a complaint and notice of hearing against Brandt based on the allegations contained in the charge brought by Local 150 (hereinafter "Case No. 12420").

In late April or early May 1998, Local 150 learned that Brandt was hiring for the construction season. On May 22, 1998, a number of active and retired business agents of Local 150, as well as those of another local union, assembled for the purpose of organizing Brandt's labor force. The next day, a group comprised of approximately eighteen union members, all wearing union insignia, traveled to Brandt's office to obtain, complete, and submit applications for employment. Upon arriving at the front door of Brandt's business office, the group observed a sign indicating that the company was not distributing or accepting employment applications. Five members of the group, nevertheless, entered the office, with a video camera in tow, while the remaining members waited outside. Once they were inside the office, the spokesman of the group informed the receptionist that it was the union's understanding that Brandt was hiring and that some of their members were interested in applying for jobs. At this point, Terry Brandt entered the room and advised the group to leave the premises or he would be forced to call the police. Irwin Brown, a consultant to the company, also appeared and informed the group that Brandt was not hiring or giving interviews, and that if the union members had been told otherwise they were misinformed.

Brown also pointed to the sign on the front door of Brandt's office, advising the group that the company only accepted applications on Mondays when it was hiring. All of the pro-union applicants left the premises when it became clear that they would not be given applications.

That same day, Marty Clark was permitted to file an employment application with the company. Clark was referred to Brandt by his stepfather, a business acquaintance of Terry Brandt. Terry Brandt reviewed Clark's application that afternoon, and, upon realizing that Clark was not referred in accordance with the company's hiring policy, sent out a letter rejecting the application. Shortly thereafter, Brandt rehired a former employee as a laborer and hired a referred applicant as a carpenter. Both applied and started work on May 26, 1998. Two other referral applicants began work in June, one on June 16th and the other on June 22nd.

In June 1998, Chuck Stevens, at the behest of Local 150, telephoned his old foreman at Brandt, Joe Copeland, to inquire as to whether he could possibly be rehired by the company.[9] According to Stevens, Copeland stated that "Local 150 guys have caused trouble and there is a sign on the door that we are not taking applications," and "I can't get you in the front door but probably could get you in the back door." Copeland then told Stevens that he would check with Charles Brandt, the company's president, and get back with him shortly. Later that month, Copeland told Stevens that he could be hired, and Stevens reported to work shortly thereafter.

_____

[9]   Stevens had worked for Brandt as a carpenter, laborer, and finisher between 1991 and 1994, but was fired for dropping an air compressor off a truck.

In 1998, Brandt received forty-four applications for laborer and operator positions, hiring twenty-six individuals from that pool of candidates—i.e., twenty laborers, two operators, two drivers, one finisher, and one carpenter. Ten of the twenty-six hires occurred in May and June 1998. All of the hired individuals' applications in 1998 came from former employees, individuals referred to the company by current supervisors or employees, or equal opportunity employment service providers. Brandt did not accept any applications from unknown or walk-in applicants that year, and only hired four employees during the fourteen day time period for which the pro-union walk-in applicants attempted to file applications.

On June 8, 1998, Local 150 filed a second unfair labor charge (number 33-CA-12686) against Brandt, which, as amended, alleged that since May 22, 1998, the company had refused to consider hiring union members. On September 22, 1998, the Regional Director issued a complaint and notice of hearing against Brandt based on the charge brought by Local 150 ("Case No. 12686"), and consolidated the case with Case No. 12420.

On November 30, 1998, a hearing was held before an administrative law judge on Case Nos. 12420 and 12686. On December 4, 1998, the hearing ended when the ALJ approved a settlement with Brandt over the objections of both the General Counsel of the National Labor Relations Board ("General Counsel") and Local 150. Thereafter, both the General Counsel and Local 150 filed a special appeal, pursuant to Section 102.26 of the Rules and Regulations of the NLRB, *see* 29 C.F.R. § 102.26 (provides for interlocutory appeals to the Board, which are discretionary), challenging the settlement. On or about February 26, 1999, the National Labor Relations Board ("Board") granted the special appeal, remanding the case back to the ALJ for further consideration.

On March 16, 1999, Local 150 filed its third unfair labor charge (number 33-CA-12942) against Brandt, which, as amended, alleged that Brandt "has in effect and continues to maintain and apply a hiring practice of giving a preference in hiring to referred applicants regardless of their skill level over walk-in or unknown applicants" and that "such policy is designed to discriminate, interfere and prevent union-affiliated applicants from being considered for employment . . . and is designed to deter the effects of union organizing in violation of the Act." On May 28, 1999, the Regional Director issued a complaint and notice of hearing against Brandt based on this charge ("Case No. 12942").

On June 11, 1999, Case No. 12942 was consolidated for hearing with Case Nos. 12420 and 12686. After a four-day hearing, the ALJ issued his decision on January 12, 2000. In that decision, the ALJ found that Brandt violated § 8(a)(1) by changing and making more onerous its hiring practices and procedures with respect to union-affiliated applicants due to: (1) the differential treatment of the three groups of pro-union applicants by Brandt on April 11, 1997; and (2) amending its hiring policy to require applicants to present photo identification before receiving an employment application.[10] The ALJ dismissed the refusal-to-hire and refusal-to-consider-for-hire charges, however, concluding that although the General Counsel had met his burden of proving that Brandt acted with anti-union animus, under the test outlined by the Board in *Wright Line*, 251 N.L.R.B. 1083, 1089 (1980), *enf'd*, 662 F.2d 899 (1st

---

[10] The ALJ found that Terry Brandt's May 10, 1997 statement concerning the union's salting campaign further buttressed a finding of anti-union animus on the part of Brandt.

Cir. 1981),[11] the company had not unlawfully refused to hire or consider hiring the pro-union applicants, noting:

> After careful consideration, I conclude that [Brandt] did not refuse to hire and/or consider hiring the 1997 and 1998 applicants because of their pro-union sentiments. Rather, I find that [Brandt] faithfully adhered to its longstanding hiring policy that has been in effect since at least 1994, and was posted on employee bulletin boards prior to the submission of the pro-union applications in April 1997.

In support of the dismissals, the ALJ also made the following findings of fact: (1) "that the March 15 conciliation agreement, entered into by [Brandt] and the U.S. Department of Labor to remedy under-representation of women and minority employees in [Brandt's] workforce, mandated hiring . . . individuals [referred by EEO service providers]"; (2) the company "consider[ed] the application of pro-union applicant Angela L. Smith and hired her as a flagger in May 1997"; (3) that "all of the positions filled [by Brandt in 1997 and 1998] were for laborer, truck driver, or flagger positions paying between $8 and [$]10 per hour," whereas "[t]he majority of the pro-union applicants . . . were higher paid skilled operators and the documents in evidence that an abundant pool of lower paying referral applicants existed for the laborer positions"; (4) "[i]n regard to the pro-union

---

[11] Under the *Wright Line* analysis, we begin by considering whether the General Counsel has proven that anti-union animus was a substantial or motivating factor in the employer's decision to make adverse employment decisions, and, if such a showing is made, we then determine whether the employer can avoid liability by demonstrating that, notwithstanding any anti-union animus, it would have taken the same action for legitimate reasons. *N.L.R.B. v. Louis A. Weiss Mem. Hosp.*, 172 F.3d 432, 442 (7th Cir. 1999).

applicants . . . who were not permitted to submit applications on May 22, 1998 . . . [Brandt] possessed an available pool of referral applicants to fill the 26 laborer positions that [the company] hired in 1998"; (5) "all of the pro-union applicants [who submitted applications in 1998] were higher paid skilled operators, and [Brandt] hired only two operators in 1998"; (6) "that unknown or walk-in candidates that did not possess pro-union sentiments were treated similarly to applicants with pro-union sentiments and did not receive applications in May 1998 under [the company's] nondiscriminatory hiring policy"; and (7) "that the individuals with pro-union sentiments attempted to file . . . applications on May 22, 1998, a day that the union observed a sign on the door that [Brandt] was not currently distributing or accepting applications or hiring employees."

Finally, the ALJ dismissed the allegation that since September 16, 1998, Brandt had in effect and maintained policies that gave preference in hiring to referral applicants with the purpose or intended effect of making it more difficult for applicants with pro-union sentiments to be considered for employment. Both Local 150 and Brandt filed exceptions to the ALJ's decision, and the General Counsel filed none.

On October 1, 2001, the Board affirmed the ALJ's "conclusion that [Brandt] did not unlawfully refuse to hire or refuse to consider for hire certain union affiliated applicants." In doing so, the Board noted that the ALJ issued his opinion before the Board published its decision in *FES (A Division of Thermo Power) and Plumbers and Pipefitters Local 520 of the United Association*, 331 N.L.R.B. No. 20, 2000 WL 627640 *6 (May 11, 2000), *review denied and petition enforced by, N.L.R.B. v. FES (A Division of Thermo Power)*, 301 F.3d 83 (3d Cir. 2002), a case that clarified the framework for analyzing refusal-to-hire and refusal-to-consider-for-hire allegations (see discussion *infra*). Nevertheless, the

Board found that "the judge's analysis in this pre-*FES* case is consistent with the . . . framework [outlined in *FES*]."

The Board agreed with the ALJ that the General Counsel had met its initial burden under the *FES* test, explaining "[i]n regard to anti-union animus, the judge found that [Brandt] violated Section 8(a)(1) of the Act by changing its hiring practices to restrict the receipt of employment applications from pro-union applicants . . . . This unfair labor practice finding demonstrates [the company's] anti-union animus." The Board also agreed, however, with the ALJ's conclusion that Brandt had met its burden of demonstrating that it would not have hired the pro-union applicants even in the absence of their union activity or affiliation, noting "the record shows that [Brandt's] established hiring policy was to give hiring preference to applicants who were current employees . . . presumably on layoff or some other form of absence from their employment . . . [;] past employees with proven safety, attendance, and work records; and applicants recommended by current supervisors and employees," and that "[t]here is no contention that any of the pro-union applicants in question were in any of the identified applicant-priority categories." In reaching this conclusion, the Board noted that: (1) Brandt "hired 55 employees during the relevant time period . . . [and that] [o]f those, 54 were referred for employment by incumbent supervisors or employees, or by Equal Employment Opportunity service providers pursuant to a conciliation agreement entered into between [Brandt] and the U.S. Department of Labor in March 1997"; and (2) "the other applicant hired during this time period was pro-union employee Angela Smith . . . ."[12]

---

[12] One Board member filed an opinion, concurring in part and dissenting in part, agreeing with the majority's dismissal of

(continued...)

For these reasons, the Board affirmed the ALJ's dismissal of the refusal-to-hire and refusal-to-consider-for-hire charges, as well as the dismissal of the allegation that Brandt maintained its preferential hiring policy with the purpose or intended effect of making it more difficult for union-affiliated applicants to be considered for employment.

The Board's order, with which Brandt has complied, directed the company to cease and desist from the unfair labor practices found; from interfering with, restraining, or coercing employees in the exercise of their rights protected by Section 7 of the NLRA, 29 U.S.C. § 157; and required the company to post an appropriate remedial notice. Local 150 filed a petition to review the Board's decision.

## II.

We have jurisdiction to review applications for enforcement and petitions for review of Board decisions pursuant to Sections 10(e) and (f) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §§ 160(e) and (f). In conducting our review, we are required to determine whether "the Board's decision is supported by substantial evidence and whether its legal conclusions have a reasonable basis in law." *L.S.F. Transp., Inc. v. N.L.R.B.*, 282 F.3d 972, 980 (7th Cir. 2002). Substantial evidence in this context means " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Roadmaster Corp. v.*

---

[12] (...continued)
the refusal-to-hire charge, but noting that she would have found a refusal-to-consider-for-hire violation under § 8(a)(3) of the NLRA.

*N.L.R.B.*, 874 F.2d 448, 452 (7th Cir. 1989) (citation omitted). This standard applies to the Board's application of the facts to the law, *N.L.R.B. v. Winnebago Television Corp.*, 75 F.3d 1208, 1212 (7th Cir. 1996), and "[w]e apply a similarly deferential standard in determining whether the Board's legal conclusions have a reasonable basis in law." *Dunbar Armored, Inc. v. N.L.R.B.*, 186 F.3d 844, 847 (7th Cir. 1999). Moreover, "we defer particularly to the Board's findings regarding credibility, which cannot be disturbed absent extraordinary circumstances." *L.S.F. Transp.*, 282 F.3d at 980. Thus, while our review of the Board's decision is meaningful, it is decidedly deferential: " 'The Board's reasonable inferences may not be displaced on review even though [we] might justifiably have reached a different conclusion . . . .' " *Dunbar Armored*, 186 F.3d at 846 (citation omitted). This deferential standard of review is appropriate "in light of Congress' intent to confer upon the Board broad authority to develop and oversee national labor policy." *L.S.F. Transp.*, 282 F.3d at 980. Against this backdrop, we consider Local 150's petition for review.

### A. The refusal-to-hire charge.

Local 150's first argument on appeal is that the Board erred in concluding that Brandt did not refuse to hire pro-union applicants. An employer violates §§ 8(a)(1) and (3) of the NLRA, 29 U.S.C. §§ 158(a)(1) and (3), if it refuses to hire an individual because of his union sentiments, membership, or activities. *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001).[13] Accordingly, an em-

---

[13] Section 8(a) of the NLRA provides that "[i]t shall be an unfair labor practice for an employer—(1) to interfere with,

(continued...)

ployer violates the Act if it refuses to hire applicants because they are union salts.[14] *Hartman Bros. Heating & Air Conditioning, Inc. v. N.L.R.B.*, 280 F.3d 1110, 1111 (7th Cir. 2002).

To establish a discriminatory refusal-to-hire violation, the General Counsel must prove, by a preponderance of the evidence, that: (1) the employer was hiring, or had concrete plans to hire, at the time of the alleged unlawful conduct; (2) that the job applicants had experience or training relevant to the announced or generally known requirements of the positions for hire, or, in the alternative, that the employer has not adhered uniformly to such requirements, or that the requirements were themselves pretextual or were applied as a pretext for discrimination; and (3) anti-union animus contributed to the decision not to hire the applicants. *FES (A Division of Thermo Power) and Plumbers and Pipefitters Local 520 of the United Association*, 331 N.L.R.B. No. 20, 2000 WL 627640 *6 (May 11, 2000), *review denied and petition enforced by*, *N.L.R.B. v. FES (A Division of Thermo Power)*, 301 F.3d 83 (3d Cir. 2002);[15] *see*

---

[13] (...continued)

restrain, or coerce employees in the exercise of the rights guaranteed in [29 U.S.C. § 157]; . . . or (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a).

[14] "Salting" is "the practice whereby a union inserts its organizers into some employer's workforce in the hope that they will be able to organize it." *Hartman Bros.*, 280 F.3d at 1111.

[15] The Board's decision in *FES* clarified the General Counsel's burden under the *Wright Line* test in the hiring context, noting "[w]e realize . . . that there has been some confusion over the

(continued...)

*also Vulcan Basement Waterproofing of Ill., Inc. v. N.L.R.B.*, 219 F.3d 677, 684 (7th Cir. 2000) (holding that in order " [t]o prove a violation [of Section 8(a)(1) or (3)], the NLRB's General Counsel must 'prove that antiunion animus was a substantial or motivating factor in the employer's decision to make adverse employment decisions' ") (citation omitted). Once this is established, the employer can avoid liability by demonstrating "that it would not have hired the applicants even in the absence of their union activity or affiliation." *FES*, 2000 WL 627640, at *6; *see also Vulcan*, 219 F.3d at 684 (holding that if the General Counsel proves anti-union animus by a preponderance of the evidence, "the employer can then avoid a finding of an unfair labor practice if it can show that it would have taken the action regardless of the employee's union activities"). If the employer makes this showing, the Board will not find a violation of the Act. *FES*, 2000 WL 627640, at *6; *see also Van Vlerah Mech., Inc. v. N.L.R.B.*, 130 F.3d 1258, 1263 (7th Cir. 1997)

In this case, the Board agreed with the ALJ that although the General Counsel had proven that Brandt displayed anti-union animus by making it more difficult for pro-union applicants to submit employment applications with the company, Brandt demonstrated that, notwithstanding this animus, it would not have hired the applicants under its nondiscriminatory, preferential hiring policy. Specifically, the Board found that all but one of

---

[15] (...continued)

requirement that the General Counsel make an initial showing that applicants have experience or training relevant to the announced or generally known requirements of the positions for hire . . . . We, therefore, clarify that the General Counsel must make this initial showing." *FES*, 2000 WL 627640, at *6.

Brandt's hires in 1997 and 1998 were referred applicants, with the one exception being pro-union applicant Angela Smith, and that the company did not hire any unknown or walk-in applicants during that time period, the manner by which all of the pro-union applicants had sought employment. Local 150 does not dispute either of these facts, but maintains that the Board, nevertheless, erred in concluding that Brandt met its burden of showing that it would not have hired the pro-union applicants even in the absence of their union activity or affiliation because: (1) the hiring policy maintained by Brandt is inherently discriminatory, destructive of the union-affiliated applicants' Section 7 rights;[16] (2) Brandt did not rely on its preferential hiring policy as a defense at the ALJ hearing; and (3) Brandt applied its hiring policy in a discriminatory manner.

We begin with Local 150's argument that Brandt's preferential hiring policy is inherently "discriminatory and destructive" of the union-affiliated applicants' Section 7 rights under the NLRA. According to the union, the Board should not have permitted Brandt to use its hiring policy as a *Wright Line* defense because "policies which effectively eliminate[ ] an entire class of applicants from con-

---

[16] 29 U.S.C. § 157 provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

sideration have been found to be discriminatory and destructive of employee rights," and because Brandt's preferential hiring policy has no "legitimate business purpose."

The ALJ dismissed the allegation that Brandt's preferential hiring policy was a mere pretense for making it more difficult for pro-union applicants to be considered for employment or to discourage membership in labor organizations, concluding that the policy of giving preferential treatment to referred applicants over walk-in or unknown applicants was not "inherently discriminatory." The Board affirmed the dismissal of this allegation (an allegation separate and apart from the refusal-to-hire charge), but in doing so questioned the ALJ's use of the phrase "inherently discriminatory," noting "there is no contention by the General Counsel that [Brandt's] hiring policy was inherently destructive of Sec. 7 rights."

The General Counsel, of course, has the discretion to decide whether or not to issue a complaint. *N.L.R.B. v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 124-25 (1987), and therefore possesses the lesser included authority to exercise exclusive control over the issues contained in any complaint that he issues. *See* § 3(d) of the NLRA, 29 U.S.C. § 153(d) (noting that the General Counsel "shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints . . . and in respect of the prosecution of such complaints before the Board . . . ."); *Williams v. N.L.R.B.*, 105 F.3d 787, 790-91 n.3 (2d Cir. 1996). Moreover, the General Counsel's decision not to issue a complaint, or to include a particular issue in a complaint, is final and unreviewable, *United Food & Commercial Workers Union*, 484 U.S. at 126. We, therefore, agree with the Board that the question of whether Brandt's hiring policy is inher-

ently discriminatory or destructive is not an issue in this case.[17]

This brings us to Local 150's second argument: that none of Brandt's witnesses testified before the ALJ that the pro-union applicants were rejected as a result of the company's faithful adherence to its preferential hiring policy. In a nutshell, the union contends that only reasons offered by Terry Brandt during the ALJ hearing for the company's refusal to hire the pro-union applicants were that: (1) there were no positions available at the time they applied; and (2) their applications expired after fourteen days. This argument, however, is based on a selective reading of Mr. Brandt's testimony before the ALJ.

At the ALJ hearing, Mr. Brandt provided extensive testimony that the company favored referred candidates

---

[17] Even if the issue were before us, it is highly unlikely that the union's argument would carry the day. *See Zurn/N.E.P.C.O.*, 329 NLRB No. 52 (1999), 1999 WL 33429961, 1 (September 30, 1999) (holding that employer who followed hiring policy that gave preference to current and former employees, as well as referrals by the employer's management, did not discriminate on the basis of union activities because "the policy does not on its face preclude or limit the possibilities for consideration of applicants with union preferences or backgrounds"); *Custom Topsoil, Inc.*, 328 NLRB 446, 447 (1999) (holding that employer did not discriminate on the basis of union activities when it differentiated between "stranger" applicants and "familiar" applicants, but did not differentiate between union and nonunion applicants). *See also N.L.R.B. v. Louis A. Weiss Mem. Hosp.*, 172 F.3d 432, 446 (7th Cir. 1999) (holding that an employer not motivated by anti-union animus may freely exercise its business judgment in hiring decisions, and that the Board should not substitute its judgment for that of the employer); *Atlas Metal Parts Co. v. N.L.R.B.*, 660 F.2d 304, 310 (7th Cir. 1981) (same).

and limited walk-in applicants, and that employment applications filed with the company would only be eligible for consideration for a period of fourteen days. Moreover, when Mr. Brandt testified that "no positions were available" for pro-union applicants, he did not assert, as Local 150 suggests, that no hiring took place during the time period in question. On the contrary, Mr. Brandt's testimony merely reflects that no positions were available for any walk-in applicants because the company was able to meet its hiring needs from a considerable pool of referred candidates. Indeed, in earlier testimony, Mr. Brandt readily acknowledged that the company conducted limited hiring during the 14-day periods that the 1997 pro-union applications were valid. He further explained that any hiring taking place at that time was for low-paid laborers and not operators, the position for which he categorized most, if not all, of the pro-union applicants. Furthermore, as noted *supra*, all of the company's hires during that time period were referred candidates. Accordingly, Mr. Brandt's testimony does not undermine the Board's conclusion that Brandt declined to hire pro-union applicants pursuant to its long standing, nondiscriminatory, preferential hiring policy.

Local 150's final argument is that Brandt applied its hiring policy in a discriminatory manner, and, therefore, the company may not use that policy as the basis of its defense to the refusal-to-hire charge. To put it more precisely, the union contends that because Brandt applied one aspect of its hiring policy in a discriminatory manner (i.e., the procedures governing the receipt and distribution of employment applications), we should presume that the company applied the remainder of its policy in a discriminatory manner. We disagree. Such a presumption would conflate the two steps of the *Wright Line* test, as clarified in *FES*, rendering the second step—i.e., wheth-

er the employer would have taken the same action even in the absence of union activity or affiliation—superfluous.

The first step of *Wright Line*, as noted *supra*, requires the General Counsel to produce enough evidence to create an inference that the employer's decision not to hire pro-union applicants was motivated by anti-union animus. *Jet Star, Inc. v. N.L.R.B.*, 209 F.3d 671, 675-76 (7th Cir. 2000). Here, the Board found that the General Counsel met this initial burden by producing evidence that Brandt changed its hiring practices to restrict the receipt of employment applications from pro-union applicants. At this point, Brandt, in order to avoid a finding of liability, was required to show that the pro-union applicants would not have been hired even if the company had not attempted to restrict or hinder the ability of those applicants to obtain and submit employment applications to the company. *Jet Star*, 209 F.3d at 675 (holding that in evaluating the employer's *Wright Line* burden "we . . . look to whether the employer was able to rebut [the General Counsel's] evidence or to show that the job action would have been taken even in the absence of the employee's protected activities"). The Board concluded that Brandt made this showing because the evidence demonstrated that the company applied its preferential hiring policy in a nondiscriminatory manner, and that the pro-union applications, submitted by union members as walk-in applicants, would have been rejected under this longstanding policy notwithstanding any anti-union animus.

The Board cannot, as Local 150 suggests, infer that Brandt's decision not to hire pro-union applicants was fueled by anti-union animus in the absence of evidence calling into question the truthfulness of the nondiscriminatory reason proffered by the company. That is because the General Counsel bears the ultimate burden of persua-

sion under the *Wright Line* test, i.e., establishing a causal link between the anti-union animus and the adverse action taken by the employer. *Wright Line*, 662 F.2d at 906-07; *FiveCAP, Inc. v. N.L.R.B.*, 294 F.3d 768, 781 (6th Cir. 2002). The ultimate inquiry under the *Wright Line/FES* analysis is not whether the employer ever exhibited anti-union animus, but whether the employer would have refused to hire the pro-union applicants even in the absence of their union activity or affiliation. *FES*, 2000 WL 627640, at *6; *see also Vulcan Basement*, 219 F.3d at 684. And although a finding of anti-union animus in one regard may make it more difficult for an employer to meet its burden of proving that its true reason for not hiring pro-union applicants was nondiscriminatory, this is ultimately a credibility determination to be made by the ALJ in the first instance and by the Board thereafter; a determination we are required to afford great deference. *L.S.F. Transp.*, 282 F.3d at 980.

Therefore, in order to prevail on its petition, Local 150 must point to evidence that significantly undermines the Board's finding that, notwithstanding any anti-union sentiments, Brandt would have rejected the pro-union applications under its nondiscriminatory, preferential hiring policy.[18] *Id.* (holding that "we defer particularly to the

---

[18] In this respect, it is irrelevant whether Brandt, as Local 150 alleges, discriminated against pro-union applicants by: (1) allowing Marty Clark to submit an employment application with the company on the same day that it refused to allow pro-union individuals to do so; and (2) being inconsistent in the application of its 14-day rule. Neither allegation bears on the question of whether Brandt applied its preferential hiring policy in a discriminatory manner. Furthermore, even were we to assume that these allegations were relevant to the

(continued...)

Board's findings regarding credibility, which cannot be disturbed absent extraordinary circumstances," and will "refuse to interfere with the Board's choice between two permissible views of the evidence, even though we may have decided the matter differently had the case been before us *de novo*"). The union attempts to make such a showing on appeal, and we shall therefore now turn to its arguments in this regard.

We begin by addressing Local 150's assertion that Terry Brandt's comment to employees that the company was no longer accepting applications over the counter (because of the union's salting campaign) sent "the clear message to the employees that they should not refer union-affiliated applicants but rather only nonunion applicants." Assuming this is a permissible inference to draw from Mr. Brandt's statement, the inference is of no use to the 1997 pro-union applicants who, by the time this statement was made (May 10, 1997), had already filed applications (April 1997) and attempted to obtain new applica-

---

[18] (...continued)
question before us, neither is supported by the evidentiary record. Instead, the record shows that although Clark was allowed to file an application on the same day that the pro-union applicants were turned away, Terry Brandt sent Clark a rejection letter that day after examining the application and noticing that Clark had not been referred in accordance with the company's hiring policy. Thus, Brandt's handling of Clark's application actually demonstrates that the company followed, rather than deviated from, its hiring policy. There is also nothing in the record to support the union's assertion that Brandt hired anyone fourteen days after the filing of an employment application. At best, the record shows that some of the individuals Brandt hired *started work* two weeks after filing their employment applications with the company.

tions (May 9, 1997) as walk-in applicants. Terry Brandt's statement, therefore, can hardly be said to have reduced the 1997 applicants' chances of being referred by the company's supervisors or employees, when none of them ever made an attempt to obtain such referrals.

As for the 1998 union-affiliated applicants, there is also nothing in the record suggesting that any of these applicants ever attempted to obtain referrals from a Brandt supervisor or employee, or through one of the equal employment opportunity service providers used by the company. Instead, the record shows that all of these applicants attempted to obtain employment applications from Brandt as walk-ins on May 22, 1998. In the absence of any effort on the part of these applicants to obtain referrals, we will not speculate as to whether the referral option was foreclosed to them because of a statement made by Terry Brandt over a year before they sought employment with the company.

Local 150's next argument is that Brandt deviated from its hiring policy by preferring applicants referred by equal employment opportunity service providers over unknown or walk-in applicants. The crux of the union's contention is that Brandt's written hiring policy does not specifically list referrals from equal employment opportunity service providers as a preferred category, and, therefore, the company failed to adhere faithfully to its preferential hiring policy when it gave applicants referred by EEO service providers priority over unknown or walk-in applicants.

In making this argument, however, the union does not point to any evidence that Brandt's "deviation" from its preferential hiring policy—i.e., giving priority to minority referrals—was fueled by anti-union animus. Instead, the union once again suggests that we should infer that the company's decision to give preferential treatment (here,

to minority referrals) was motivated by anti-union animus even in the absence of corroborating evidence. Without such evidence, this is something we are rarely, if ever, inclined to do. *See Vulcan Basement*, 219 F.3d at 685-87; *Starcom, Inc. v. N.L.R.B.*, 176 F.3d 948, 951-52 (7th Cir. 1999); *Louis A. Weiss Mem. Hosp.*, 172 F.3d at 443-48.

And here, there is nothing in the record even remotely suggesting that Brandt's decision to give minority referrals preferential treatment was motivated, in any respect, by anti-union animus. Indeed, the record shows that the company gave preferential treatment to applicants referred by EEO service providers pursuant to a conciliation agreement that the company entered into with the U.S. Department of Labor on March 15, 1997. Under this agreement, Brandt agreed to increase the number of women and minorities on each job in order to be in compliance with certain equal employment opportunity guidelines.

Moreover, Brandt's decision to give preferential treatment to applicants referred from EEO service providers is entirely consistent with the company's longstanding policy of hiring individuals referred from sources that it deems trustworthy over unknown or walk-in applicants; a policy formulated long before Local 150's salting campaigns.[19] An employer who follows established hiring

---

[19] Local 150 contends that substantial evidence does not support the Board's characterization of Brandt's preferential hiring policy as "long standing" or "established." We disagree. The Board agreed with the ALJ that "Terry Brandt credibly testified that . . . the portion of the hiring policy regarding referral of applicants . . . has been rigorously followed since at least 1994," and that the company "faithfully adhered to its long standing policy that has been in effect since at least 1994, and was

(continued...)

practices can rebut the General Counsel's showing of anti-union motivation if the hiring practices in question do not preclude the consideration of union applicants. *Zurn/N.E.P.C.O.*, 329 NLRB No. 52 (1999), 1999 WL 33429961, 1 (September 30, 1999) (holding that employer who followed hiring policy that gave preference to current and former employees, as well as referrals by employer's management, did not discriminate on the basis of union activities because "the policy does not on its face preclude or limit the possibilities for consideration of applicants with union preferences or backgrounds"); *Custom Topsoil, Inc.*, 328 NLRB 446, 447 (1999) (holding that employer did not discriminate on the basis of union activities when it differentiated between "stranger" applicants and "familiar" applicants, but did not differentiate between union and non-union applicants).[20]

In this case, Brandt's preferential hiring policy did not prevent the pro-union applicants from being considered for employment with the company. What doomed their applications was the decision to apply as walk-ins, an

---

[19] (...continued) posted on the employee bulletin boards prior to the submission of the pro-union applications in April 1997." Having reviewed the record, we believe that substantial evidence supports the Board's findings in this regard.

[20] *Cf. N.L.R.B. v. Newtown Corp.*, 705 F.2d 873, 874 (6th Cir. 1983) (holding that if an employer has an established policy of granting regular, periodic wage increases, "to honor that policy by granting the raise is not an unfair labor practice"); *N.L.R.B. v. Rich's of Plymouth, Inc.*, 578 F.2d 880, 886-87 (1st Cir. 1978) (holding that employer did not violate NLRA by following established policy of refusing to rehire union employees who quit).

applicant pool of last resort for the company. Thus, while Brandt may have technically deviated from its *written* hiring policy, there is no evidence that the company's decision to do so was in any way fueled by anti-union animus. As previously noted, there is substantial evidence of the exact opposite: that Brandt faithfully adhered to its established hiring policy of favoring referred candidates over unknown or walk-in applicants, regardless of union affiliation.

Local 150 also maintains that Brandt deviated from its hiring policy when it failed to give preference to pro-union applicants Roger Hoffman, Ron Miller, Don Peden, and Jack Schadt, all of whom submitted applications in April 1997 and apparently once worked for the company. The record shows, however, that Terry Brandt had no knowledge that any of these individuals had previously worked for the company at the time their applications were under consideration. In fact, not one of these applicants listed their prior employment with Brandt on their applications, or, for that matter, informed the company of this information through any other means. In the absence of any evidence that Brandt was actually aware of the applicants' prior employment history, we fail to see how the union can claim that they were entitled to preferential treatment under the company's hiring policy. Finally, it is also worth noting that all four applicants were experienced operators, a position that the company had no openings for during the fourteen day period their applications were on file.

Finally, Local 150 argues that Brandt applied its hiring policy in a discriminatory manner when it failed to give the 1998 pro-union applicants preferential treatment. The union claims that these applicants informed Brandt, at the time they attempted to file applications, that they

were referred by company employees, and therefore, entitled to preferential treatment under the company's hiring policy. A cursory review of the record, however, demonstrates that these applicants merely told a Brandt consultant, Irwin Brown, that it was their understanding that company employees *could* make referrals. Local 150, therefore, has no basis for asserting that the 1998 union-affiliated applicants were entitled to preferential treatment under the company's hiring policy.

In sum, given Brandt's non-discriminatory preference for referred candidates, its receipt of a sufficient number of referred candidates to fulfill its hiring needs, its decision to hire pro-union applicant Angela Smith, and that the company did not hire any walk-in applicants, regardless of union affiliation, we conclude that substantial evidence supports the Board's dismissal of the refusal-to-hire charge against Brandt.

### B. The refusal-to-consider-for-hire charge.

Local 150 also contends that the Board erred when it concluded that Brandt did not violate § 8(a)(1) and (3) of the NLRA by refusing to consider hiring the union-affiliated applicants. To establish a refusal-to-consider-for-hire violation, the record must show: "(1) that the respondent excluded applicants from a hiring process; and (2) that anti-union animus contributed to the decision not to consider the applicants for employment." *FES*, 2000 WL 627640, at *10. As in a refusal-to-hire case, the burden then shifts to the employer to demonstrate that it would not have considered the applicant even in the absence of union affiliation. *Id.* If the employer meets this burden, the Board will not find a violation. *Id.*

Local 150 contends that Brandt unlawfully refused to consider hiring pro-union applicants because it "manipulated, changed, and altered its hiring practices to make it more difficult for union applicants to apply for positions of employment . . . ." As we have already noted, it is undisputed that Brandt displayed anti-union animus toward the pro-union applicants by making it more difficult for them to obtain and file applications with the company. The ultimate question, however, is whether, notwithstanding this anti-union animus, the pro-union applicants would have been considered for employment with the company. *Id.* The Board concluded that Brandt did not unlawfully refuse to consider hiring the pro-union applicants because even if the company had not made it more difficult for them to apply (e.g., by requiring photographic identification), they would not have received any consideration under the company's preferential hiring policy as walk-in applicants, noting "the walk-ins never made it 'to any other cut . . . . They got deleted immediately.' "(quoting Terry Brandt's testimony before the ALJ). The pro-union applicants were given the same minimal consideration as all other walk-in or unknown applicants, and there is no evidence that the union-affiliated applicants attempted to obtain, or were precluded from obtaining, a referral from one of the company's supervisors or employees or from one of the EEO service providers used by the company to meet its labor needs.

Because substantial evidence supports the Board's conclusion that it was the union-affiliated applicants status as walk-in/unknown applicants, rather than their union activities, that caused them not to be considered for employment, we find no basis for disturbing the Board's dismissal of the refusal-to-consider-hiring charge against Brandt.

**III**.

For the reasons outlined in this opinion, the union's petition for review is DENIED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*